# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

In re

JACKSON HOSPITAL & CLINIC, INC., *et al.*,

    Debtors.

Case No. 25-30256-CLH
Chapter 11
Jointly Administered

---

JACKSON HOSPITAL & CLINIC, INC.,

    Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD OF ALABAMA,

    Defendant.

Adv. Proc. No. 26-03013

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

On June 16, 2026, this adversary proceeding came before the Court for an expedited evidentiary hearing on the Plaintiff's Emergency Motion for Preliminary Injunction [Doc. No. 25][1] (the "Motion") filed by Jackson Hospital & Clinic, Inc. (the "Hospital"). Appearances were as noted in the record. The Court has considered the evidence presented, the arguments and representations of counsel at the hearing, Blue Cross and Blue Shield of Alabama's Opposition to Plaintiff's Emergency Motion for Preliminary Injunction [Doc. No. 33] (the "Opposition"), and the Plaintiff's Reply in Support of Emergency Motion for Preliminary Injunction [Doc. No. 50] (the "Reply").

---

[1] "Doc. No." refers to the docket number for a filing in this adversary proceeding, Adversary Proceeding Number 26-03013.

# INTRODUCTION

The evidence presented at the hearing largely tracks with what has been presented to the Court throughout the Hospital's bankruptcy case. In essence, the Hospital – while providing high-quality essential healthcare services to the River Region – is operating at a loss. The Hospital suffered operating losses before filing its bankruptcy case, and it has sustained operating losses throughout, notwithstanding the relief afforded by the Bankruptcy Code.[2]

On April 21, 2026, the Hospital and one of its affiliates, JHC Pharmacy, LLC, presented to the Court for confirmation the Second Amended Joint Plan of Reorganization for Jackson Hospital & Clinic, Inc. and JHC Pharmacy, LLC [Main Case Doc. No. 1547][3] (the "Plan"). The Plan followed a year filled with often contentious hearings related to post-petition financing and the treatment of various creditor constituencies, and it incorporates vigorously negotiated settlements among those same constituencies.

At the confirmation hearing, the Hospital disclosed that negotiations and litigation with Blue Cross Blue Shield of Alabama ("BCBSAL") were ongoing, and that the feasibility of the Plan depended, in part, on increased reimbursement rates from BCBSAL going forward. The Hospital did not, however, explicitly state that without drastic increases in reimbursement rates from BCBSAL, the Hospital could not emerge from bankruptcy and would be forced to shut down within three months. Not having been informed of the centrality and urgency of this issue, the Court confirmed the Plan. Approximately four weeks later, the Hospital filed the instant adversary proceeding and the Motion, presenting a picture of anything but feasibility.[4]

---

[2] All references to the "Code" or the "Bankruptcy Code" are to 11 U.S.C. §§ 101-1532.

[3] "Main Case Doc. No." refers to the docket number for a filing in the Hospital's underlying bankruptcy case, Bankruptcy Case Number 25-30256.

[4] Under Bankruptcy Code Section 1129(a)(11), to confirm a plan, the proponent must prove that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

2

The Hospital now asks the Court to do what the Bankruptcy Code does not permit – the unilateral alteration of the provider agreements between the Hospital and BCBSAL.[5] The Hospital seeks relief in a breach of contract action through entry of a preliminary injunction that forces BCBSAL to pay reimbursement rates not on the terms agreed to by the parties, but rather on par with the reimbursement rates paid to the hospital in its closest geographic proximity. While the Court is not ruling on the merits of the breach of contract claim the Hospital asserts in this adversary proceeding, the Court concludes that the Hospital has not met the extraordinarily high burden required for affirmative injunctive relief, and that the Motion is due to be denied.

### JURISDICTION AND AUTHORITY TO ENTER FINAL JUDGMENTS

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered by United States District Court for the Middle District of Alabama on April 25, 1985. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Hospital and BCBSAL do not agree on whether this is a core proceeding under 28 U.S.C. § 157(b)(1), but they have consented to this Court's entry of final orders and judgments, as contemplated under 28 U.S.C. § 157(c)(2).

### FINDINGS OF FACT

A. Documentary Evidence

The relevant facts are largely undisputed and can be derived from either the exhibits admitted into evidence or through judicial notice of the filings in this adversary proceeding and the Hospital's bankruptcy case.[6] The Hospital and BCBSAL are parties to agreements covering

---

[5] *See* 11 U.S.C. § 365(a); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("[T]he debtor must accept the contract as a whole[,] mean[ing] that the debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement.")

[6] The Parties stipulated to the admission into evidence of the exhibits disclosed and exchanged in advance of the hearing. The parties also stipulated to the admissibility of documents of record in this adversary proceeding and the Hospital's bankruptcy case.

3

the two broad categories of care provided by the Hospital: that certain Participating Hospital Contract for Prospective Payment dated as of July 1, 2003 (as amended from time to time, the "Inpatient Agreement"); and that certain Preferred Outpatient Facility Contract dated as of January 1, 2006 (as amended from time to time, the "Outpatient Agreement," and, together with the Inpatient Agreement, the "Provider Agreements"). *See* Plaintiff's Exhibits 1 and 2. The Inpatient Agreement contains steps to prospectively establish reimbursement rates for subsequent years through negotiation and mutual agreement. *See* Plaintiff's Exhibit 1. The Outpatient Agreement also provides for amendments to reimbursement rates by mutual agreement, although the amendments are to the Outpatient Agreement itself. *See* Plaintiff's Exhibit 2.

Over the years, the Hospital and BCBSAL (together, the "Parties") have entered into formal letters of agreement amending the Provider Agreements to reset reimbursement rates. *See* Defendant's Exhibits 3, 4, 5, 7, and 8. During some years, the Hospital requested – and BCBSAL agreed to – off-cycle mid-year increases to the reimbursement rates, including reimbursement rates for 2026. *See* Defendant's Exhibits 5 and 13. Moreover, in 2023, the Hospital requested and received from BCBSAL a $1.5 million advance payment of future reimbursements. *See* Defendant's Exhibit 6.

The instant adversary proceeding and the Motion relate to the 2026 reimbursement rates paid by BCBSAL to the Hospital under the Provider Agreements. Initial negotiations regarding the 2026 reimbursement rates culminated in a letter of agreement signed on May 13, 2025, with a 2% base increase, plus up to a 2% additional increase tied to certain agreed-upon performance metrics. *See* Defendant's Exhibit 8. In mid-November, BCBSAL met with the Hospital's then newly-appointed CEO, Jon Quinlivan, to explore another amendment to the 2026 reimbursement rates. *See* Plaintiff's Exhibit 6; *see also* Defendant's Exhibits 10, 11, and 12. Discussions between the parties resulted in BCBSAL's December 4, 2025, proposed letter of agreement that provided

4

for a base increase of 12%, plus up to a 2% additional increase tied to certain agreed-upon performance metrics. *See* Defendant's Exhibit 13.

While subsequent communications indicated that an agreement along those general terms was imminent, Mr. Quinlivan ultimately backed away from BCBSAL's offer and indicated that the Hospital would accept only an increase in the reimbursement rate structure that equaled BCBSAL's reimbursement rate structure with Baptist Medical Center South ("Baptist South"). *See* Defendant's Exhibit 12. BCBSAL did not agree to this proposal, citing multiple factors unrelated to geography that drove the negotiations and agreements between BCBSAL and its providers. *See id.* Ultimately, the Parties entered into a letter of agreement on December 31, 2025, which reflected the terms of BCBSAL's proposed December 4, 2025, letter of agreement. *See* Defendant's Exhibit 13.

The reimbursement rates BCBSAL pays the Hospital are – by the Hospital's own design[7] – intertwined with the Hospital's bankruptcy case and the viability of the Plan. *See* Main Case Doc. No. 1547, at p. 48. Without limitation, Section 10.2 of the Plan contains conditions precedent to the Effective Date (as defined in the Plan), colloquially referred to as the point at which the Hospital "emerges from bankruptcy." *Id.* at pp. 47-48. As referenced in the Motion, Section 10.2(h) of the Plan establishes as a condition precedent that "[the Hospital] shall renegotiate prior and future reimbursement rates with Blue Cross and Blue Shield of Alabama on terms acceptable to the Debtors." *Id.* at p. 48.

The Plan further provides, however, that the conditions precedent to the Effective Date can be waived. *Id.* at p. 49. Section 10.3 states, with exceptions not applicable to the Motion, that: "[t]he Debtors, with the consent of JHS and the DIP Lender, may waive, in whole or in part, any

---

[7] The Hospital requested, and the Court granted, multiple motions to extend the Hospital's exclusive right to file and solicit votes on a plan under Bankruptcy Code Section 1121. Main Case Doc. Nos. 551, 800, 998, 1117, 1317.

5

of the conditions to the confirmation or effectiveness of this Plan."[8] *Id.* In fact, the Hospital has offered to waive the condition precedent set forth in Section 10.2(d) (related to receipt of grant money from the State of Alabama) but only if Section 10.2(h) (requiring that BCBSAL reimbursement rates are renegotiated on terms acceptable to the to the Hospital) is satisfied. Main Case Doc. No. 1779.

After the Court confirmed the Plan and the Hospital filed this adversary proceeding, the Hospital's Board of Directors passed a resolution related to the reimbursement rates. *See* Plaintiff's Exhibit 3. In the resolution, the Hospital acknowledged and approved financial projections attached as an exhibit to the resolution. *See id.* The board further resolved to close the Hospital if it did not, by June 25, 2026, "receive reimbursement rates for the Hospital from [BCBSAL] that are equal to similarly situated facilities, or raise additional capital, and provide for the financial and operational sustainability of the Hospital . . . ." *Id.*

Another exhibit, along with one of the Hospital's filings related to the Plan, includes financial projections aimed at demonstrating how increased reimbursement rates would improve the Hospital's financial performance. *See* Plaintiff's Exhibit 17; Main Case Doc. No. 1588, at pp. 5-18. These exhibits can be contrasted with the operating reports the Hospital has filed during its bankruptcy case, which largely reflect operating losses that have been occasionally and partially offset by cash infusions. *See, e.g.,* Defendant's Exhibit 22.

B.  Witness Testimony

At the hearing, the Parties elicited the testimony of: John Quinlivan, current Chief Executive Officer of the Hospital; Allen Wilen, current Chief Restructuring Officer of the

---

[8] "JHS" is defined in the Plan as Jackson Hospital Services, Inc., a 501(c)(3) not for profit corporation. Section 5.3 of the Plan provides that the Hospital will be changed to a member managed nonprofit corporation managed by JHS. "DIP Lender" is defined as Jackson Investment Group, LLC, which provided post-petition financing to the Hospital in an aggregate amount of up to $35,000,000.00 pursuant to various orders of the Court and which would extend a secured exit loan facility of $75,000,000.00 on the Effective Date.

Hospital; Joseph H. Oaks, Vice President of Provider Contracting and Pricing for BCBSAL; and Brian Edwards, Senior Vice President of Health Services for BCBSAL. While cross-examination revealed some potential inconsistences and a lack of knowledge regarding certain issues, the Court generally found each of the witnesses to be forthright and candid. Moreover, the Court sincerely appreciates the witnesses' willingness to attend the hearing and testify on extremely limited notice.

In the Motion, the Hospital asserts that if BCBSAL is not "*immediately* compelled" to pay the same reimbursement rates to the Hospital that it pays Baptist South, it will result in the following:

- ***Jackson Hospital will <u>not</u> successfully emerge from bankruptcy;***

- ***Jackson Hospital will <u>not</u> receive $40 million in funding from the State of Alabama; and***

- ***Jackson Hospital will be forced to <u>permanently</u> <u>close</u> and no longer provide essential care to the residents of Alabama.***

Doc. No. 25 at p. 3 (all emphasis in original). To clarify these assertions and how they relate to the Plan, the Court asked Mr. Quinlivan whether the State of Alabama, Montgomery County, or the City of Montgomery had conditioned their grants on the requested increase in the Hospital's reimbursement rates from BCBSAL. Mr. Quinlivan stated that these grants were not conditioned on increased reimbursement rates.

<b>CONTENTIONS OF THE PARTIES</b>

While the facts regarding the Provider Agreements and related letters of agreement are largely undisputed, the Parties have vastly different views on how those facts should be interpreted. The Hospital's central argument is that while BCBSAL twice increased reimbursement rates for 2026, those increases reflect a lack of good faith negotiations. The Hospital asserts that BCBSAL's failure to match the Baptist South's reimbursement rates constitutes *per se* proof that BCBSAL

7

has utilized its leverage over the Hospital to impose unfair and unsustainable rates. BCBSAL asserts that the exhibits evidence good faith negotiations, noting that on multiple occasions BCBSAL – at the request of the Hospital – agreed to mid-cycle reimbursement rate increases. BCBSAL argues that it was unreasonable for the Hospital to demand reimbursement rates equal to Baptist South's rates, as reimbursement rates determined by multiple factors: comparison to Medicare rates; patient acuity and case mix; the volume of BCBSAL patients treated; the scope of medical services offered; geographic coverage; and performance against quality and value-based metrics.

## LEGAL ANALYSIS

Against this backdrop, the Court must consider whether the Hospital has met its burden with respect to the relief requested in the Motion. A court may grant injunctive relief only if the movant proves:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir.1998) (internal citations omitted)). In the Eleventh Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." *Siegel*, 234 F.3d at 1176 (quoting *Robertson*, 147 F.3d at 1306 (internal citations omitted)). The grant of a preliminary injunction "is the exception rather than the rule," and the movant must clearly carry the burden of persuasion. *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir.1975).

The movant's evidence and argument must be even more compelling when the movant seeks a mandatory or affirmative injunction, in which the movant seeks to change the *status quo*

8

to force a party to act. *Mercedes-Benz U.S. Intern., Inc. v. Cobasys, LLC*, 605 F.Supp.2d 1189, 1196 (N.D. Ala. 2009) (citing *Exhibitors Poster Exchange, Inc. v. Nat'l Screen Service Corp.,* 441 F.2d 560, 561 (5th Cir.1971).[9] "[W]hen a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Exhibitors Poster Exchange, Inc.,* 441 F.2d at 561 (quoting *Miami Beach Federal Sav. & Loan Ass'n. v. Callander,* 256 F.2d 410, 415 (5th Cir.1958)). "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite,* is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews,* 544 F.2d 1233, 1243 (5th Cir.1976).

A. Likelihood of Success on the Merits

The Hospital has not clearly established a likelihood of success on the merits under the standards outlined above. The Hospital equates failure to agree to pay the Hospital the same reimbursement rates as Baptist South with a failure to negotiate in good faith. BCBSAL's disagreement with the Hospital on the appropriate method for setting rates does not mean BCBSAL failed to negotiate in good faith. The documentary evidence demonstrates that BCBSAL provided rational explanations for the difference between the rates for the Hospital and the rates for Baptist South. Moreover, the documentary evidence shows that BCBSAL revisited the 2026 reimbursement rates and increased them by 10% over the previously agreed-upon rates, which directly controverts the Hospital's argument that BCBSAL refused to negotiate in good faith. While it may be that the Hospital can further develop its case and possibly succeed at a full trial on the merits, at this time, the Hospital has failed to introduce sufficient evidence to demonstrate a substantial likelihood of success of the merits. As such, the Hospital has not overcome the heavy

---

[9] Decisions of the Fifth Circuit Court of Appeals before October 1, 1981, are binding in the Eleventh Circuit Court of Appeals unless subsequently overruled. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

burden established by the controlling law on affirmative injunctions. For the sake of completeness, however, the Court will analyze each prong in turn.

B. <u>Irreparable Injury to the Hospital</u>

The Hospital has not established that it will suffer irreparable injury if the Court does not unilaterally increase reimbursement rates under the Provider Agreements. To the contrary, the evidence conclusively belies the Hospital's allegation in the Motion that it cannot emerge from bankruptcy, will lose funding from the State of Alabama, and will be forced to close absent this Court's immediate issuance of an affirmative injunction. In direct contradiction to what the Hospital implies in the Motion, its Chief Executive Officer testified that he had been involved in discussions with the State of Alabama, Montgomery County, and the City of Montgomery (the "Government Entities") and that the funding of their grants was not contingent on the Hospital's reimbursement rates being raised to match that of Baptist South. The Hospital's CRO, Allen Wilen, testified that the grant from the State of Alabama was restricted to use on Hospital infrastructure. However, no such restrictions are in place for the grants from Montgomery County or the City of Montgomery.

In essence, $80.0 million in grant money is available to the Hospital following the Effective Date of the Plan, and the sole remaining condition precedent to the Effective Date is the renegotiation of the reimbursement rates "on terms acceptable to" the Hospital. As noted above, this condition can be waived by the Hospital (with the consent of JHS and the DIP Lender). Yet, the Hospital will not waive this condition. Even if half of the grant money is restricted to infrastructure (which in any event is essential to operations), there remains $40.0 million in unrestricted grant money available, giving the Hospital freedom to utilize operational revenue and other financial resources to fund operations.

This evidence is fatal to the Motion. The risk of immediate irreparable harm is the creation of the Hospital, JHS, and the DIP Lender. A lifeline – offered in good faith by the Government Entities – has been thrown to the Hospital, but the Hospital will not grab it. Instead, the Hospital has filed the Motion, and its board has passed a resolution setting a deadline of June 25, 2026, for either BCBSAL (by agreement) or this Court (by a mechanism so extraordinary that the Hospital could not point the Court to any case in which it has ever been utilized) to raise reimbursement rates.

The Court understands and agrees the Hospital's argument that continuing operations at a loss is unsustainable. But the Hospital has been operating at a loss for some time now, and certainly throughout the Hospital's bankruptcy case. The DIP Lender has advanced tens of millions of dollars to prop up operations during the bankruptcy case, and if the DIP Lender chooses not to advance more funds, that is a perfectly rational and justifiable business decision. But it is disingenuous for the Hospital to suggest that the only way to maintain normal operations beyond the self-imposed June 25, 2026, deadline is through an affirmative injunction issued on an expedited basis. There may be a risk of irreparable harm, but it is manifestly *self-harm*. By the terms of the Plan and through the generosity of the Government Entities, a June 25, 2026, closure is unequivocally avoidable. For that reason, the Hospital cannot meet its burden on this prong of the analysis.

C. <u>Weighing Injury to the Hospital Against Potential Damage to BCBSAL</u>

Given that the injury to the Hospital is avoidable, it is difficult to conceive of a scenario where its potential injury outweighs the potential damage to BCBSAL. However, another aspect of the Motion demonstrates the imbalance. While not addressed during arguments at the hearing, the Hospital's position on posting a bond under Rule 65 of the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure, is a particularly

11

telling indicator of where the Hospital intends to place the risk of harm. The Hospital states in the Motion its willingness to post a bond, but requests that the Court require it to provide "only the minimum amount of security the Court deems reasonable and necessary." Doc. No. 25, at p. 16. In the Reply, the Hospital argues that the bond should be nominal and even goes so far as to suggest the Court should consider dispensing with a bond altogether. See Doc. No. 50, at pp. 13-14.

On the one hand, the Hospital argues that it risks imminent closure because it is about to run out of money, and on the other hand it argues that there is no risk whatsoever to BCBSAL if the Court takes the extraordinary and unprecedented step of forcing BCBSAL to pay reimbursement rates it did not agree to and ultimately is vindicated on appeal. According to the Hospital's exhibit, the damages associated with a reversed ruling could total over $13.0 million over the remainder of 2026 and over $30.0 million during 2027. *See* Plaintiff's' Exhibit 17. With the Hospital taking a position this extreme on this issue of weighing the potential harm to the parties, and particularly because the asserted potential irreparable harm is eminently avoidable, the Court finds that the Hospital has not met its burden on this prong of the analysis.

D. Public Interest

The Court emphatically agrees with the Hospital that the public interest will be served by the Hospital's continued operations. The Patient Care Ombudsman's supplemental report presents a powerful record of the meaningful and far-reaching benefits the Hospital provides to the River Region. *See* Main Case Doc. No. 1777. However, the mechanism the Hospital seeks to employ – a preliminary injunction pursuant to which the Court rewrites a contract and imposes terms of performance on a party that it did not agree to – is antithetical to the public interest.

"The law regards the sanctity of contracts and requires the parties to do what they have agreed to do." *Samuel H. Cottrell & Son v. Smokeless Fuel Co.,* 148 F. 594 (4th Cir.1906) (citing *Dermott v. Jones,* 69 U.S. 1, 6, 2 Wall. 1, 17 L.Ed. 762 (1864)).

12

> First and foremost, the sanctity of contracts is one of the basic principles of all jurisprudence. It is one of the fundamental doctrines of Anglo-American law. If contracts were to be easily set aside and repudiated, one of the very bases of our law would be gone.

*Randolph v. Ottenstein*, 238 F. Supp. 1011, 1013 (D.D.C 1965). The Court simply cannot overstate the adverse effect on the public interest that would result from upending a bedrock legal principle, especially when the irreparable harm contemplated in the Motion is wholly avoidable by the Hospital. The relief requested is so extraordinary that the Parties could not produce, and the Court could not find, a single instance in which a court provided relief similar to what the Hospital requests here. The sanctity of contracts is such a cornerstone to our legal system and economy that not even the Bankruptcy Code alters it. While the Bankruptcy Code facilitates a debtor's reorganization through a wide variety of tools, the Bankruptcy Code does not allow a debtor to alter an executory contract. *See* 11 U.S.C. § 365; *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). If nothing else, the inability under the Bankruptcy Code to impose on an objecting party an altered contract should provide a helpful gauge of the extreme relief requested in the Motion. For this reason, the Court finds that the Hospital has not met its burden on this prong of the analysis.

**CONCLUSION**

It pains the Court to enter an order that could result in the Hospital's unnecessary decision to cease operations. Throughout the Hospital's bankruptcy case, the Court entered orders that – some might reasonably argue – stretched the bounds of what the Bankruptcy Code permits, all to give the Hospital an opportunity to better position itself financially. When the Hospital came to the Court with its Plan, the Court took the Hospital at its word that the Plan was feasible, only for the Court subsequently to be told by the Hospital less than a month later that if the Court does not reach well beyond the limits of the Bankruptcy Code and other applicable law, the hard work of

the Hospital's staff and the professionals during the Hospital's bankruptcy case would have been for naught. Regrettably, the Court has neither the factual nor legal basis to go beyond those limits. For that reason, the Court finds that the Hospital has failed to meet the extraordinarily high burden necessary to obtain a preliminary injunction.

Accordingly, the Motion is hereby DENIED.

Done this 17th day of June, 2026.

Christopher L. Hawkins
United States Bankruptcy Judge

c:      Chase J. Potter, Attorney for Plaintiff
        Joshua J. Iacuone, Attorney for Plaintiff
        Stuart H. Memory, Attorney for Plaintiff
        Jayna Partain Lamar, Attorney for Defendant
        Ryan D. Thomspon, Attorney for Defendant
        Carl Burkhalter, Attorney for Defendant
        Nicolas Peck, Attorney for Defendant

14